UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



THE PAUL RUDOLPH FOUNDATION,

                Plaintiff,

   -against-

PAUL RUDOLPH HERITAGE FOUNDATION
and ERNST WAGNER

                Defendants.

No. 20 Civ. 8180 (CM)

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

Plaintiff, the Paul Rudolph Foundation ("PRF" or "Plaintiff"), brings this nine-count action against Defendants, the Paul Rudolph Heritage Foundation ("Heritage") and Ernst Wagner ("Wagner," together "Defendants"), for trademark infringement, copyright infringement, violation of the Computer Fraud and Abuse Act, and related New York state statutory and common law claims. Plaintiff also seeks a declaratory judgment that the works transferred to the Paul M. Rudolph Archive at the Library of Congress are in the public domain and that Defendants' copyright registration covering those works is invalid.

Defendants move to dismiss the First Amended Complaint ("FAC," dkt. 24). That motion is GRANTED in part and DENIED in part. Count III is dismissed with prejudice, Counts VII and IX are dismissed without prejudice, and the motion is otherwise denied.

**BACKGROUND**

I.    **Factual Background**

Although the FAC is replete with allegations regarding Wagner's alleged dishonest and malicious conduct, I here summarize only those facts relevant to the Defendants' motion to dismiss the FAC.

*A.  The Parties*

Plaintiff is a New York-based non-profit organization. It was founded after the death of renowned modern architect Paul Rudolph, to preserve his legacy as Chair of the Yale Department of Architecture and Brutalist/Modernist architectural designer.  (FAC ¶ 1, 8.)

Defendant Wagner was one of the founding members of the plaintiff foundation, as well as its former president.  Wagner is domiciled in New York.  (FAC ¶ 2.)

On March 2, 2014, Wagner was voted off Plaintiff's Board, after other members grew unhappy with his behavior.  (FAC ¶¶ 76-85.)

Heritage is a New York-based non-profit organization formed by Defendant Wagner in 2015 after his ouster from PRF.  (FAC ¶ 99.)  Heritage operates out of a property at West 58th Street in Manhattan, the former headquarters of PRF.  (FAC ¶ 105.)

*B.  Rudolph's Estate*

    (1) The 1996 Will

On September 30, 1996, Rudolph executed a will. (the "'96 Will). Under this will, a $2,000,000 testamentary trust was established for the benefit of Wagner, Rudolph's longtime friend.  The trust was to be funded by the sale of certain real property at 23 Beekman Place in Manhattan.  (FAC ¶ 13.)

In the '96 Will, Rudolph bequeathed the physical copies of his drawings, plans, renderings, blueprints, models, papers, treatises, and other materials related to his architectural practice (the

"Rudolph Archive") to the Library of Congress. (FAC ¶ 10.) "), which named his attorney John Newhouse as his executor. (FAC ¶¶ 11, 12.) There was no mention of any disposition of the intellectual property in those materials in the 1996 Will; but Wagner was named as the residuary beneficiary under the Will (FAC ¶ 23.) Assuming arguendo that the intellectual property was part of the residue – as plaintiff alleges (FAC ¶ 22) – it appears to this court that Wagner would have succeeded to those rights under the 1996 Will, even though, according to Plaintiff, Rudolph wanted scholars and the public to have meaningful access to his work. (FAC ¶ 9)

John Newhouse, Rudolph's long-time attorney in fact and health care agent, was named as Executor of the 1996 Will.

(2) The 1997 Will

On March 17, 1997, Rudolph suffered a heart attack. Plaintiff alleges that, while Rudolph was in a coma, Wagner and his attorney, Thomas Heckman, devised a plan to draft a new will that would convey a greater share of Rudolph's assets to Wagner. (FAC ¶¶16-18.)

On April 16, 1997, shortly after Rudolph awoke from the coma, Rudolph executed a new will ("'97 Will"). In that will, Rudolph bequeathed to Wagner $1,000,000 outright, as opposed to $2,000,000 in trust. The '97 Will also provided for the outright transfer to Wagner of a piece of property on  West 58th Street that Rudolph owned.  (FAC ¶ 20.) And the will made other, unspecified changes that were deemed

In the '97 Will, as in its predecessor, Rudolph bequeathed his Archive to the Library of Congress. (*Id.*) Again the Will said nothing about the intellectual property rights appurtenant to the physical items in the Archive (FAC ¶ 22). However, the residuary beneficiary under the 1997 Will was not Wagner, but the Library of Congress Trust Fund Board (LOCTFB). (FAC ¶ 24.)

(3) The Guardianship Proceeding, Rudolph's Death, the Will Contest and Reformed Will

3

In July of 1997, Rudolph's sister and his office manager instituted an Article 81 guardianship proceeding, alleging that Wagner had induced Rudolph to amend his will to Wagner's benefit. (FAC ¶ 25.) Rudolph died before the hearing took place, and the '97 Will was submitted for probate. (FAC ¶¶ 26, 28.) Plaintiff alleges that Newhouse (Rudolph's attorney) sought leave to file objections to the '97 Will. (FAC ¶ 29.) It also alleges that a Court-appointed Evaluator questioned whether Rudloph had the capacity to execute documents during the period when the '97 Will was signed. (FAC ¶ 26)

On June 6, 2001, Wagner, Wagner's attorney Heckman, Newhouse, and the LOCTFB resolved the probate challenges by entering into a stipulation of settlement ("Stipulation of Settlement"), and by modifying the terms of the '97 Will. (FAC ¶ 31.) This "Reformed Will" is the will that was eventually probated.

Article THIRD provides for a bequest of certain tangible property to Wagner. Excluded from that property in the Reformed Will is the following:

> Currency and any and all drawings, plans, renderings, blueprints, models, papers, treatises, and other materials that I prepared or had prepared in connection with my professional practice of architecture which is hereinafter specifically disposed of in Article FOURTH hereof.

Article FOURTH of the Reformed Will bequeathes all such materials to the LOCTFB. With respect to that bequest, the Stipulation of Settlement provides as follows:

> In furtherance of fulfilling the wishes of Paul M. Rudolph as set forth in Article FOURTH of the Reformed 1997 Will, the LOC Trust Fund Board shall transfer to the Library of Congress those items among the Architectural Archives and among the items set forth in Paragraph 5 below that the Library of Congress determines are suitable for its collections. The intellectual property rights of all such items transferred to the Library of Congress shall be dedicated to the public.

(FAC ¶ 32.) Plaintiff alleges that approximately 20,000 works physical works from the Rudolph Archive (some of which are the subject of this dispute) were ultimately donated

4

to the Library of Congress and became part of the public domain. Plaintiff further alleges that the phrase "The Intellectual property rights of all such items transferred to the Library of Congress shall be dedicated to the public," means that the Estate voluntarily and irrevocably abandoned Rudolph's intellectual property rights in those 20,000 works. (FAC ¶ 40).

Per the complaint, Wagner inherited the West 58th Street Property. (FAC 60).

### C. Paul Rudolph Foundation

Plaintiff is a charitable organization that began operating under the name Paul Rudolph Foundation in 2002. (FAC ¶ 48.) Plaintiff alleges that it has used the name exclusively and continuously in connection with promoting public awareness of architectural preservation and restoration, including on the internet and its social media accounts. (FAC ¶¶ 49, 51.) Plaintiff's name, Paul Rudolph Foundation, is a registered trademark, and has allegedly acquired strong secondary meaning. (FAC ¶ 55.)

From 2002 until 2014 Wagner served on Plaintiff's Board, including as its President. During that period, the Plaintiff Foundation operated out of the West 58th Street property. During portions of that period, both Plaintiff and a business operated by Wagner out of the same premises, Modulightor, even shared a computer server.

However, the FAC alleges a variety of ways in which Wagner – even during his term as President of Plaintiff's Board – sought to undermine Plaintiff's operations and aggrandize his own role as the conservator of Rudolph's memory. As a result, Wagner was voted off the Board in 2014, whereupon he evicted Plaintiff from that property. Plaintiff migrated its files to a cloud based server after it parted ways with Wagner, ultimately deleting them. (FAC ¶ 61)

5

D. *Paul Rodolph Heritage Foundation*

After Wagner was thrown out of the Paul Rudolph Foundation, Plaintiff alleges that Heritage is a copycat organization that engages in business activities that are duplicative of Plaintiff's. (FAC ¶ 101-112.) According to the FAC, Wagner deliberately chose the name for the Paul Rudolph Heritage Foundation to create confusion and benefit from the goodwill associated with Plaintiff's Paul Rudolph Foundation mark. (FAC ¶ 100.)

The First Amended Complaint is replete with allegations of deliberate copying of Plaintiff's material by the Defendant Foundation (see., e.g. FAC ¶ 112) and instances of confusion between the two enterprises (persons appearing at events sponsored by Defendant thinking they were appearing at an event sponsored by Plaintiff; individuals tagging the wrong social media posts; persons contacting the wrong organization to conduct tours of the West 58th Street property). The Complaint also alleges that Defendant has misappropriated and exhibited on the internet property that belongs to Plaintiff, including donations of Rudolph material that were made to Plaintiff and solicited and accepted while Wagner was associated with Plaintiff and photographs of Rudolph works that were copyrighted by Plaintiff. (FAC ¶112-120) And it alleges that Defendants have falsely accused Plaintiff of possessing property that belongs to Wagner (but which does not in fact belong to Wagner) and of holding itself out as the Rudolph Estate (which is is not), while asserting that Wagner's Foundation holds "termination rights to any license or transfer of copyright" (FAC ¶ 127), including specifically copyrights that were dedicated to the public via transfer to the LOCTFB and so extinguished.

Plaintiff also alleges that Wagner, or someone acting at his behest, stole material belonging to Plaintiff that was formerly stored on the shared server – including 24 photographs of Rudolph's Brookhollow Plaza building in Dallas, Texas, that were taken by George Balle and registered for

copyright by Plaintiff with the U.S. Copyright Office in 2020 (the "Balle Photographs"). (FAC ¶ 57-59.) Heritage has allegedly posted at least one of the Balle Photographs on its Instagram page, with a caption claiming that the image "is from the archives of the Paul Rudolph Heritage Foundation." (FAC ¶ 114 & Ex. 6.) Plaintiff also alleges that Heritage has posted other images that it could only have obtained by accessing Plaintiff's deleted files and has claimed ownership of those materials in their captions. (FAC ¶¶ 119, 120.)

*E. Dispute Over Plaintiff's Social Media*

Plaintiff alleges that, in the fall of 2019, Defendants lodged a bad faith campaign against Plaintiff's social media presence by submitting at least 36 takedown notices to Facebook and Instagram under the Digital Millennium Copyright Act (the "DMCA"). (FAC ¶ 130.) Each notice asserted that a particular photo posted on one of Plaintiff's account infringed on Defendants' valid copyright. Plaintiff alleges that among the 36 images that were the subject of the takedown notices were digitized images taken from the Rudolph Archive – *i.e.*, images that were given to the Library of Congress and whose IP rights were dedicated to the public pursuant to the Stipulation of Settlement. (FAC ¶ 131.)

As a result of Defendants filing the DMCA takedown notices, Instagram disabled Plaintiff's account on November 1, 2019, and Facebook disabled Plaintiff's account on an unspecified date. (FAC ¶ 133.) Plaintiff has since regained access to its Facebook account; its efforts to obtain access to its Instagram account are ongoing. (FAC ¶ 137.)

Plaintiff responded by filing counterclaims with Facebook, alleging that the takedown notices filed by Defendants fraudulently claimed intellectual property rights to the photographs posted on Plaintiff's account when, in reality, the posted photographs were in the public domain. On November 11, 2019, Plaintiff received a letter from Defendants, in which Defendants

threatened to file a lawsuit in response to the counterclaims Plaintiff filed with Facebook. (FAC ¶ 138.)

### F. *Defendants' Copyright Reg. No. VAU001380158*

Plaintiff alleges that on November 13, 2019 (while the parties were disputing the DMCA takedown notices), Defendants registered a collection of 152 photos of Rudolph's architectural works with the U.S. Copyright Office (under U.S. Copyright Reg. No. VAU001380158), including certain images from the Rudolph Archive, the rights to which were expressly dedicated to the public pursuant to the Stipulation of Settlement. (FAC ¶¶ 228, 232.)

## II. **Procedural History**

On October 1, 2020, Plaintiff filed the original complaint in this action. (Dkt. 1.) On January 14, 2021, Plaintiff filed the FAC. (Dkt. 24.) The nine-count FAC alleges violations of the Lanham Act arising from defendants' infringement of Plaintiff's trademark (Count I) and unfair competition (Count II); New York's false advertising statute (Count III); common law trademark infringement and unfair competition (Count IV); and violations of the federal Copyright Act (Count V), the DMCA (Count VIII), and the Computer Fraud and Abuse Act (Count IX). Plaintiff also seeks declarations that (i) the materials in the Rudolph Archive are in the public domain (Count VI), and (ii) that intellectual property rights to certain material were dedicated to the public, and that Defendant's copyright registration of that material is invalid (Count VII).

Before the Court is Defendants' motion to dismiss all but Counts I, II, and IV – the trademark infringement and unfair competition counts. (Dkt. 29.)

8

## DISCUSSION

### III.   Legal Standards

#### A.  Rule 12(b)(6)

"To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

#### B.  Rule 12(b)(1)

For a federal court to have subject-matter jurisdiction over a case, a plaintiff must have standing.  The " 'irreducible constitutional minimum' " of standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

### IV.   The Motion to Dismiss Count III (NYGBL 133, 349, 360-1) Is GRANTED

#### A.  Applicable Law

To bring a claim for deceptive acts or practices in the conduct of business under the New York statute, plaintiff must allege that: (1) the challenged act or practice was consumer-oriented; (2) it was misleading in a material way; and (3) plaintiff suffered injury as a result of the deceptive act. *New World Sols., Inc. v. NameMedia Inc.*, 150 F.Supp.3d 287 (S.D.N.Y. 2015); *Burberry Ltd. v. Euro Moda Inc.*, No. 08CV5781–CM, 2009 WL 1675080, at *16 (S.D.N.Y. June 10, 2009).

"Section 349 is a consumer protection statute which, until 1980 when it was amended to allow a private right of action, was enforceable only by the State Attorney General." U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158, 176 (S.D.N.Y. 2001). Thus, conduct prohibited by the statute usually "involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Gottlieb Dev., LLC v. Paramount Pictures Corp.*, 590 F.Supp.2d 625, 636 (S.D.N.Y.2008) (internal citation omitted).

Corporate competitors, as opposed to consumers, may bring a claim under that statute "so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *DO Denim, LLC v. Fried Denim, Inc.*, 634 F.Supp.2d 403, 408 (S.D.N.Y. 2009). A corporate competitor alleging harm to its own business must also allege that the challenged conduct has "significant ramifications for the public at large." *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 277 F.Supp.2d 269, 273 (S.D.N.Y. 2003); *see also LBF Travel, Inc. v. Fareportal, Inc.*, No. 13–CV–9143, 2014 WL 5671853, at *10 (S.D.N.Y. Nov. 5, 2014) (report and recommendation) (explaining same). That is because Section 349 is, at its core, a consumer protection statute; a corporate competitor plaintiff states a claim under the statute "only if it asserts consumer injury or harm to the public interest." *Perkins School for the Blind v. Maxi–Aids, Inc.*, 274 F.Supp.2d 319, 327 (E.D.N.Y. 2003). When such a claim is brought by a corporate competitor, courts have required that the alleged harm be akin to the sort of offense to the public interest that would trigger FTC intervention under 15 U.S.C. § 45 – namely, a situation that poses danger to public health or safety. *See Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 448 (S.D.N.Y. 2020) (quoting *RCA Trademark Mgmt. S.A.S. v. Voxx Intern. Corp.*, 2015 WL 5008762, at *4 (S.D.N.Y. 2015)).

### B. Application

Defendants argue that claims involving trademark violations are not cognizable under N.Y. GBL § 349 unless "'there is a specific and substantial injury to the public interest'" that rises above "'ordinary trademark infringement or dilution.'" (Def's Mot. at p. 30 (quoting *New World Sols., Inc.*, 150 F. Supp. 3d at 331–32.) That is correct. Where a claim arises out of a trademark infringement dispute between competitors, "the core of the claim is harm to another business as opposed to consumers," and any alleged harm to the public is "too insubstantial to satisfy the pleading requirements," necessary to survive a Rule 12(b)(6) motion. *Gucci America*, 277 F.Supp.2d at 273.

Plaintiff fails to allege harm to the public sufficient to sustain its § 349 claim. Plaintiff's allegations concerning public interest are limited to conclusory assertions that Defendants' acts intended to, and did in fact, mislead, deceive, and confuse the public as to the identity of Defendants. (FAC ¶¶ 157, 160, 177.) The FAC focuses on the alleged harms suffered by Plaintiff, not by the public, beyond bald assertions of public confusion. (*See* FAC, ¶ 176) (the challenged acts "were intended to confuse, and did confuse, consumers as to the relationship between Plaintiff and Defendants, all causing damage and irreparable harm to Plaintiff"). Plaintiff identifies no facts from which this Court may infer that the "core" of its claims is harm to the consuming public, and not just harm to Plaintiff's own business interests. *See Gucci America*, 277 F.Supp.2d at 273. It is well established that claims "alleging only general consumer confusion do not threaten ... direct harm to consumers for purposes of stating a claim under section 349." *Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 136 (S.D.N.Y. 2010). And there are certainly no allegations of potential for injury to the public health or safety.

Plaintiff argues that a § 349 private plaintiff need plead only three elements: (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way;

and (3) that plaintiff suffered injury as a result of the deceptive act. (Opp. at p. 29.) But that is incorrect. Courts have consistently found that the gravamen of a § 349 claim is "'injury or harm to the public interest,'" *Tropical Sails Corp. v. Yext, Inc.*, No. 14–CV–7582, 2015 WL 2359098, at *3 (S.D.N.Y. May 18, 2015) (quoting *Schnabolk*, 65 F.3d at 264), and have dismissed claims that do not rise to that level. Because the FAC fails to allege any harm to consumers that risese to a level that would interest the FTC,  Plaintiff has not stated a viable claim under N.Y. GBL § 349. Count III is, therefore, dismissed.

## V.    Count V: Copyright Infringement

Defendants move to dismiss Count V under Rule 12(b)(1), for lack of standing, and Rule 12(b)(6), for failure to state a claim. This motion is DENIED.

### A.  12(b)(1)

Standing to sue for copyright infringement is governed by section 501(b) of the 1976 Copyright Act, which provides: "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C.A. § 501(b).  Moreover, "[a] certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003).

Defendants argue that Plaintiff lacks standing to bring a copyright infringement claim because, "Plaintiff does not allege ownership of copyright in 2019 or authorization to sue for infringements" and because "the bare assignment of an accrued cause of action are incorrect." (Def's Mot. at p. 22.) The Second Circuit has recognized that an owner of an exclusive right is entitled to institute an action for infringement of that right committed prior to a grant of copyright from the grantor, provided that the document granting the copyright expressly includes the causes

of action with respect to that right, accrued prior to the grant. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 944 F.2d 971, 980 (2d Cir. 1991). But "if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them." *Id.*

Defendants rely on *Getty Images* for the proposition that Plaintiff lacks standing to bring this claim without a specific assignment of the right to prosecute accrued causes of action. That is not the case here. Plaintiff does not claim to have been granted the rights to an accrued cause of action along with the copyright assignment. Plaintiff alleges that, at all times pertinent to the FAC, Plaintiff owned the copyrights to the Balle Photographs. Accepting the allegations as true, as I must, the fact that Plaintiff did not *register* its copyright with the Copyright Office until the year after the alleged infringement is irrelevant. One must register a copyright in order to bring suit for infringement; but one can own a copyright that is not registered. According to the FAC, Plaintiff obtained the copyrights to the Balle Photographs sometime after their creation in 2009, but before the alleged infringement took place in 2019. That gives Plaintiff standing to bring Count V.

*B.  12(b)(6)*

The allegations must include a "plain statement of the claim showing that the pleader is entitled to relief" to provide the defendant with adequate notice of the claim against him, and of the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555.

This district employs a four-prong test to determine whether a claim of copyright infringement is adequately plead. "To survive dismissal, the complaint must allege: '(1) which specific original works are the subject of the copyright claim, (2) that plaintiff owns the copyrights in those works, (3) that the copyrights have been registered in accordance with the statute, and (4) by what acts and during what time the defendant infringed the copyright.'" *Energy Intelligence Group, Inc. v. Jeffries*, LLC, 101 F.Supp.3d 332, 338 (S.D.N.Y. 2015).

Defendants appear to argue that the FAC fails to allege the fourth element of a copyright infringement claim, on the ground that "conclusory allegations that Defendants committed direct, vicarious and contributory infringement of unpublished Balle Photographs" are insufficient. (Def's Mot. At p. 22.) They are wrong. Plaintiff specifically alleges that Defendants "posted, without authorization, one of the copyrighted Balle Photographs on its Instagram page," and attach the Instagram post as Exhibit 6. (FAC ¶ 114.) The FAC narrows the infringing act to the unauthorized publishing of one specific photograph in 2019, which is sufficiently specific to put Defendants on notice. *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 n.3 (S.D.N.Y. 1992), *aff'd sub nom. Kelly v. L.L. Cool J*, 23 F.3d 398 (2d Cir. 1994). The *Kelly* court determined that the copyright infringement claim was sufficiently plead because plaintiff narrowed the infringing act to the publishing and distribution of two specific songs during 1991. *Id.* Although the allegations did not specify the nature of the claimed infringement, "such a level of specificity is not required" to state a claim for copyright infringement. *Id.*

The FAC makes a short, plain statement of the subject of the claim, as required by Rule 8. The motion to dismiss Count V, for copyright infringement, is denied.

It is, however, the case that Section 412 of the Copyright Act precludes statutory damages or attorneys' fees for any infringement of copyright in an unpublished work commenced before the effective date of its registration. 17 U.S.C. § 412; *Fischer v. Forrest*, 968 F.3d 216, 220 (2d Cir. 2020). The registration dates of the Balle Photographs are all in 2020, after the alleged infringement occurred in January of 2019. Because the first (and only) alleged act of infringement occurred prior to the registration date of the copyright, it would appear that Plaintiff is not entitled to attorney's fees on its copyright claim. However, this issue need not be (and is not appropriately) resolved on a motion to dismiss, but if and when we get around to calculating damages.

**VI.     Counts VI and VII (The Declaratory Judgment Counts)**

Plaintiff asserts two different claims under the Declaratory Judgment Act. In Count VI, it seeks a declaration that it has the right to use the materials that were donated to the Library of Congress because those materials are in the public domain, since the stipulation of settlement "dedicates" the copyright in those works to the public. In Count VII, it seeks a declaration that a November 13, 2019 copyright registration by Defendants in 152 photographs of Rudolph's architectural works are invalid; these works are among the 20,000 that were donated to the Library of Congress.   Defendants move to dismiss both counts as non-justiciable, in that there is no live case in controversy to be resolved, which would make the court's opinion on either claim an advisory opinion.

The DJA provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

"[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Because Article III of the Constitution authorizes federal courts to adjudicate only "cases" or "controversies," U.S. Const. Art. III, § 2, an "actual controversy must be extant" not just "at the time the complaint is filed," but throughout "all stages" of the litigation. *Alvarez v. Smith*, 558 U.S. 87(2009). The controversy must at all times remain "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune*, 549 U.S. at 127 (quoting *Aetna Life Ins. Co.*, 300 U.S. at 240–241). "Throughout the litigation, the party seeking relief must have

suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *United States v. Juvenile Male*, ——U.S. ——, 131 S.Ct. 2860, 2864 (2011) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). As with any federal action, courts may not entertain actions for declaratory judgment "when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action." *Flast v. Cohen*, 392 U.S. 83, 95 (1968) (footnotes omitted).

Under the DJA, a party who wishes to engage in conduct that may infringe another's intellectual property rights may seek a declaration that those rights are invalid without first exposing itself to liability. 28 U.S.C. § 2201(a); *MedImmune*, 549 U.S. at 129–30. However, the dispute must be "presented in the context of a specific live grievance." *Golden v. Zwickler*, 394 U.S. 103, 110 (1969), that justifies invoking the protection of the courts to shield the plaintiff against the defendant's "actual interference" with its legal interests. *Goosby v. Osser*, 409 U.S. 512, 517 (1973).

Thus, even when parties "continue to dispute the lawfulness" of the conduct that gave rise to the action, their dispute is not justiciable if "that dispute is [not] embedded in any actual controversy about the *plaintiffs'* particular legal rights." *Alvarez*, 130 S.Ct. at 580 (Emphasis added). Divorced from "any concrete actual or threatened harm," the parties' "abstract dispute about the law . . . falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Id*. at 580–81.

### A.   Counts VI Alleges a Case in Controversy

The Declaratory Judgment Act states:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of *any interested party* seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis added).

As the Supreme Court has noted, "Basically, the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "[T]he requirement" is "that there be a specific and immediate dispute between the parties." *Velvet Underground v. Andy Warhol Foundation for the Visual Arts, Inc.*, 890 F.Supp.2d 398, 406 (S.D.N.Y. 2012). Further, the Second Circuit has directed that "a cour*t must* entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (quoting *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970)) (emphasis added). "If either prong is met, the action must be entertained." *Id.*

The FAC highlights that Defendant filed "36 takedown notices" with Facebook against Plaintiff, and has filed comparable complaints with Instagram; as a result, Plaintiff's Instagram and Facebook accounts were disabled as a result. (*See* FAC ¶¶ 130, 133, 137). Plaintiff alleges that Defendants' false assertion of IP rights over the contents Rudolph Archive caused Facebook and Instagram to restrict access to Plaintiff's accounts pursuant to the DMCA. Plaintiff alleges that Defendants' position violates the Stipulation of Settlement, which caused ownership of the contested materials to be reposed in the Library of Congress, with their IP rights "dedicated the

public" – which is to say, it extinguished the copyrights. By asserting that Plaintiff has no right to post these works, Defendant is causing actual harm to the Plaintiff, which is being denied access to its social media accounts, without which it cannot promote its business.

Even more concretely, Plaintiff alleges that it has received a letter from Defendants' counsel threatening to sue Plaintiff over the DMCA counterclaims that Plaintiff filed with Facebook, after Facebook restricted access to Plaintiff's account.   Although "reasonable apprehension of imminent suit" is not required for a plaintiff to meet the requirements of Article III, *see MedImmune*, 594 U.S. at 132 n.11, Defendants' threat of a lawsuit forces upon Plaintiff "the choice between abandoning [its] rights or risking prosecution" – the "dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 129 (internal quotation and citation omitted).

Defendants's reliance on *Shaw Family Archives, Ltd. V. CMG Worldwide, Inc.*, No. 05 Civ. 3939(CM), 2008 WL 4298548 (S.D.N.Y. Sept. 11, 2008) for the proposition that Count VI is non-justiciable is flawed, given the radically different factual and procedural posture of the two cases.

In *Shaw* – a case with which this court has some passing familiarity – the plaintiffs sought a judgment declaring that the defendants had falsely claimed ownership of the copyright in certain photographs of Marilyn Monroe taken years earlier by their father. Plaintiffs claimed that the photographs had passed into the public domain – which, if true, would mean that they could be used by anyone, for any purpose.  The plaintiffs asserted that defendants' threats to sue them for copyright infringement inhibited them from using the so-called "public domain" photos in connection with their various licensing activities.  And indeed, one of the defendants actually had sued plaintiffs for copyright infringement, but withdrew the lawsuit *with prejudice* just prior to

filing a motion for summary judgment dismissing the plaintiff's declaratory judgment claim on grounds that there was no justiciable controversy.

This court granted defendants' motion because the plaintiffs had not produced any evidence tending to show that they had a "definite intent and apparent ability to commence use" of the public domain images. *Id.* at *2 (quoting *Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 395 (S.D.N.Y. 1993)). The only evidence was to the effect that the plaintiffs had plans to license – i.e., give other people permission to use – the iconic Monroe pictures taken by Ted Shaw. *Id.* at *3. But because the photographs were in the public domain, plaintiffs had nothing to license. As they did not identify any other commercial use they planned to make of the photographs, there was no case in controversy left for this Court to decide. *Id.* Significantly, had defendants not abandoned their copyright lawsuit with prejudice – a procedural maneuver designed to get rid of an existing case and controversy -- the result in *Shaw* would have been different.

Count VI is distinguishable from *Shaw* in several important respects. First this case is at the motion to dismiss stage, not the summary judgment stage. Second, while Defendant has not yet sued Plaintiff for copyright infringement – it has only threatened to – that threat is real and viable; whereas in *Shaw*, the Defendant gave up its right to sue Plaintiffs for past infringements by dismissing their already asserted claims *with prejudice*. Addresing the future, Plaintiff here has identified a commercial use for the disputed photographs in connection with its business, which is and always has been the promotion of Rudolph's work; Defendants have interfered and are interfering with that business use, not just by claiming of the copyright in the photographs, but by filing takedown notices with social media sites, which has caused and is causing Plaintiffs to be locked out of their own social media accounts.

In short, assuming the allegations of the complaint to be true, there is a case in controversy to be decided here.

I admit that the claim could have been pleaded more artfully, so that it was more readily apparent that Plaintiffs are not simply seeking a declaration to resolve an interesting argument over the ownership of Rudolph's intellectual property. In particular, Plaintiff could have made it clearer, in the section of its pleading that is specifically addressed to Count VI, that its (Plaintiff's) right to use what it believes to be public domain images of Rudolph's work in its business operations (which consist of promoting and educating the public about Rudolph's work) has been called into question by Defendants' assertion -- in, *inter alia*, the Take Down notices -- that Plaintiff is posting these images in violation of Defendants' intellectual property rights. That fact, which tethers Count VI to a case and controversy, must be inferred from allegations that appear elsewhere in Plaintiff's prolix pleading. But the necessary facts are pleaded; there is a real and live controversy about whether Plaintiff has the right to use the images in connection with its business activities.

### B.  Count VII Does Not Allege a Case or Controversy

Even drawing all inferences in favor of the Plaintiff (as I must, on a motion to dismiss), I cannot say that Count VII differs materially from the situation in *Shaw*. The mere fact that Defendants have registered a copyright that Plaintiff claims is invalid does not give rise to declaratory judgment jurisdiction, *Velvet Underground v. Andy Warhol Found. For the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 405-06 (S.D.N.Y. 2012) (collecting cases), and right now that is all that Count VII pleads. The Plaintiff believes that Defendants cannot obtain a copyright in a

photograph of Rudolph's public domain works; Defendants disagree.[1] But that theoretical disagreement does not give rise to any cause of action in favor of Plaintiff. If Plaintiff planned to use Defendants' copyrighted photographs in the course of their business there would be a live case – but there is no such allegation to be found anywhere in the complaint. All Plaintiffs appear to want is a declaration that Defendant cannot copyright its photographs. Therefore, Count VII must be dismissed. I will dismiss this claim without prejudice, in case Plaintiffs do have the concrete intention to use the photographs and wish to amend their pleading accordingly. But if the claim is repleaded it must be tethered to an actual dispute over the use of Defendant's copyrighted material.

### C.  Count VI Is Not Otherwise Dismissible

Defendants also move to dismiss Count VI on other grounds, none of which is persuasive.

First, Defendants argue that Plaintiff is asking this Court to relitigate issues that have already been resolved by the Stipulation of Settlement. This "sorts, kinda res judicata" argument is without merit.

In support of this argument, Defendants point to text that appeared on the Library of Congress's website in December 2019. It reads "Researchers should be aware that the Estate of Paul Rudolph/Paul Rudolph Heritage Foundation claims rights in these materials despite the language in the stipulation of settlement."  Defendants contend that this text (1) precludes any finding that the interpretation of the Stipulation of Settlement, as it pertains to the public domain status of the Rudolph Archive, remains unsettled, and (2) resolves the question in their favor.

That is ridiculous. The Library of Congress has decided to warn its patrons that Defendants are asserting claims to intellectual property "despite the language in the stipulation of settlement."

---

[1] I note that Plaintiff believes itself to hold a copyright in photographs of one of Rudolph's public domain works

The LOC is not thereby admitting that Defendants have any rights – to the contrary, the  plain language of the Library's statement suggests that the LOC itself thinks that Defendants have no rights to assert, but wishes to warn its users that Defendants might try to assert a copyright that the LOC does not believe they actually own.  It does not dispose of any "actual controversy" over whether Defendants have any copyrightable interest in the Rudolph Archive.

Defendants also argue that an agreement between Rudolph and a representative of the Library of Congress ("Agreement of Deposit"), which the two signed shortly before Rudolph's death in July 1997, defines the phrase "dedicated to the public"  in a way that differs from Plaintiff's interpretation as pleaded in the FAC. There are many flaws in Defendants' argument, but the principal one is that, on this motion to dismiss, the court will not be resolving conflicting contract interpretations – especially involving a document that (1) is not pleaded in the complaint, (2) predates the Stipulation of Settlement by some years, and (3) may well have been superseded by the 1997 Will and the Stipulation of Settlement, since the Agreement of Deposit explicitly provides that any future gift to the Library of Congress (i.e., any gift that comes by way of bequest upon Rudolph's death) "shall terminate the deposit of the property constituting such gift."  (*Id.*) Such issues are more appropriately considered on a motion for summary judgment – not one addressed to the pleadings.

Second, Defendants invoke the probate exception -- a judicially created doctrine that holds "probate matters" are excepted from the scope of federal diversity jurisdiction – to argue that the court lacks subject matter jurisdiction over these counts. *Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 105 (2d Cir. 2007) (citing *Marshall v. Marshall*, 547 U.S. 293, 299 (2006)). This, too, is too far a reach.

As the Supreme Court clarified in *Marshall*, the probate exception "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Marshall*, 547 U.S at 311. The probate exception does not "bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* "[S]o long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a res in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed it must, exercise it." *Lefkowitz*, 528 F.3d at 106 (citing *Marshall*, 547 U.S. at 299).

Plaintiff does not ask this Court to "probate a will or administer an estate directly." *Id.* at 105. Indeed, because "few practitioners would be misdirected as to seek, for example, letters testamentary of letters of administration from a federal judge, the first prong of the probate exception is rarely, if ever, violated. *Moser v. Pollin*, 294 F.3d 335, 340 (2d Cir. 2002).

Moving on to the second prong of the *Lefkowitz* test, the threshold question is whether the disputed property is in the "custody" or under the "control" of the state probate court. *Lefkowitz*, 528 F.3d at 106-07. Even with the probate exception, federal courts still possess jurisdiction "so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." *Markham*, 326 U.S. at 494, 66 S.Ct. 296. As I observed in *Days Inn Worldwide, Inc. v. Hazard Mgmt. Grp., Inc.*, 2012 WL 5519356, at *2 (S.D.N.Y. Nov. 13, 2012), "it turns out that the [probate] exception is quite narrow." Indeed, "A federal court may exercise jurisdiction to determine rights to property in probate 'where the final judgment does not undertake to interfere with the state court's

possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court.'" *Id.* (quoting *Markham,* 326 U.S. at 494).

Defendants' reliance on *Architectural Body Rsch. Found. v. Reversible Destiny Found.,* 335 F. Supp. 3d 621, 631 (S.D.N.Y. 2018) is yet another misguided attempt to wedge this case into inapplicable precedent. In *Architectural Body*, probate proceedings were active and on-going; the artwork at issue was, unlike the Rudolph Archives material, in the custody and control of the probate court, because the estate's assets had not yet been administered. As Plaintiff points out, there is no *res* remaining in the custody and control of the probate court, because the probate proceeding concluded 20 years ago. The probate court no longer has custody and control over the Rudolph Archives. Indeed, by filing "take-down" notices pursuant to the DMCA, Defendants effectively claim to be in custody and control over the Rudolph Archives.

Plaintiff does not ask the Court to "assert control" over the intellectual property rights to the materials in question. The probate court already asserted control over the intellectual property rights to the Rudolph Archives in 2001, and, in exercising its control, adjudicated those rights by approving the Stipulation of Settlement in 2001. The intellectual property rights were administered by the Stipulation of Settlement, which, as Plaintiff pleads, dedicated the copyrights to the public. Counts VI and VII seeks a declaration that the Rudolph works covered by Stipulation of Settlement are in the public domain by virtue of the fact that the stipulation "dedicated" the intellectual property rights to the Rudolph Archives "to the public." "Merely determining the rights to, as opposed to administering, assets is not proscribed by the probate exception." *Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.,* 918 F.2d 1065, 1072 (2d Cir. 1990).

Third, Plaintiff has standing to bring count VI.  Plaintiff has alleged specific harms relating to the Take Down notices, and has a continuing "reasonable apprehension of a lawsuit being filed." *See Velvet Underground*, 890 F.Supp.2d at 406.

Finally, Count VI seeks a declaration pursuant to the DJA -- not, as Defendants mistakenly assert, pursuant to the Copyright Act. As explained previously, the DJA provides that, where there is an actual controversy, any Article III court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Plaintiff seeks a declaration that it is entitled to use the items in the Rudolph Archive (Count VI) in its work. That the Copyright Act does not provide for declaratory relief is, therefore, irrelevant.

The motion to dismiss Count VI is, therefore, DENIED; while the motion to dismiss Count VII is GRANTED without prejudice.

## VII.   Count VIII: DMCA

### A.  Applicable Law

The DMCA provides, in relevant part, as follows:

> Any person who knowingly materially misrepresents under this section ... that material or activity is infringing ... Shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer ... as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.
> 17 U.S.C. § 512(f)(1).

To state a claim, Plaintiff need only plead (i) that Defendants knowingly misrepresented to Facebook and Instagram that Plaintiff was posting images on their accounts in violation of Defendants' purported copyrights to those images; (ii) that, relying on Defendants' willful misrepresentation, Facebook and Instagram removed or disabled access to the images in question; and (iii) that, as a result of the aforementioned series of events, Plaintiff has incurred damages.

Defendants argue that Plaintiff's DMCA claim for damages must be dismissed for failure to allege a knowing misrepresentation. I disagree.

## B. Application

The DMCA provides an avenue through which copyright holders can notify online service providers, like Facebook and Instagram, when their sites are hosting or providing access to infringing images. Defendants correctly note that, to file a DMCA "take-down notice," copyright holders need only act on a good faith belief in their purported copyright, and copyright holders are "not liable for misrepresentation under the DMCA if they subjectively believe the identified material infringes their copyright, even if that belief is ultimately mistaken." *Ningbo Mizhihe I&E Co. v. Does 1-200*, 2020 WL 2086216, at *3 (S.D.N.Y. Apr. 30, 2020), *reconsideration denied*, No. 19 CIV. 6655 (AKH), 2020 WL 8838036 (S.D.N.Y. June 19, 2020) (quoting *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34, 44 (S.D.N.Y. 2017). But Plaintiff does not allege that Defendants were mistaken in its belief that it held the copyrights to the Architecture Archive photos that were the subject of the take-down notices. Plaintiff specifically alleges in the complaint that the take-down notices "concerned photographs whose intellectual property rights were dedicated to the public" via Stipulation of Settlement. FAC ¶ 262. The complaint further alleges that Defendants' take-down notices were made with "an anticompetitive intent and otherwise designed to harm Plaintiff rather than protect any valid and enforceable intellectual property right," because Defendants "could not have reasonable believed that Defendant Wagner still held the copyright to photographs denoted to the Library of Congress by Rudolph's restated will." FAC ¶¶ 268-69. Plaintiff has alleged that the take-down notices constitute knowing misrepresentations regarding the copyright to the images. That Defendants disagree with the allegations is a different story, and not one that supports their 12(b)(6) motion to dismiss for failure to state a claim.

Defendants' reliance on *Ningbo* is unhelpful. 2020 WL 2086216. In *Ningbo*, the court found conclusory allegations of "knowing" misrepresentations to be insufficient, where the claim was really charging the take-down filer with failure to perform a thorough investigation into the status of its copyrights. *Id*. at *3. The court found fatal the absence of any allegations as to whether or when the counterclaim defendant was made aware that it was seeking to enforce a copyright that it did not hold. *Id.* In the instant case, Plaintiff alleges that Defendants knew that Defendant Wagner did not own the copyright to the images that Plaintiff posted on its social media channels, because Wagner abandoned the copyrights when he executed the Stipulation of Settlement, which dedicated the intellectual property rights of the images to the public domain. FAC ¶ 262. While the truth of these allegations must be ascertained at a later stage of litigation, they are sufficient as stated to survive a motion to dismiss.

## VIII.   Count IX: CFAA

### A.   Statute of Limitations

Plaintiff brings Count Nine under the CFAA which subjects to liability, "Whoever ... knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1–year period." 18 U.S.C. § 1030(a)(4). The statute of limitations on a civil CFAA action requires that the suit be filed "within 2 years of the date of the act complained of or the date of the discovery of the damage." *Id.* § 1030(g); *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015). The statute of limitations ran from the date that Plaintiff discovered that someone had accessed its protected data without authorization, *i.e.*, in January of 2019 when one of the Balle Photographs was posted to

Defendants' Instagram account.   Plaintiff filed this action within the two-year statute of limitations; its claim is not time barred.

*B. Loss*

Under the CFAA, "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). But "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.*

This claims founders because Plaintiff fails to allege that any security breach incurred. Plaintiff specifically alleges that Defendants either (i) accessed and copied the Balle Photographs from the shared server before Plaintiff deleted them, or (ii) recovered Plaintiff's deleted data from the shared server. (FAC ¶ 62.) Either scenario involves Defendants' accessing a shared server that it had a right to access. Plaintiff does not challenge Defendants' right to access the server, rather, it alleges that Defendants misused copyrighted photos found on that shared server.

The CFAA "as a whole indicates Congress's intent to prohibit access of a computer without authorization," and not a defendant's "misuse of information that he or she was entitled to access or obtain." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010). While there need not be any physical damage or interruption to Plaintiff's computer or computer system, Plaintiff still must plead that it was damaged by defendant's unauthorized use of a computer or computer system, and not just by whatever Defendants did with the data they retrieved once on the system.   Despite the length of Plaintiff's pleading, it has not alleged what it needs to allege.

There is also an issue relating to the damages that are alleged. The subsection (c)(4)(A)(i) factor apparently relied on by Plaintiff is "loss to 1 or more persons during any 1–year period ...

aggregating at least $5,000 in value." 18 U.S.C. § 1030(c) (4)(A)(i)(I). The statute defines "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § (e)(11). Courts in this district have construed "loss" more narrowly as "a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted*." Mktg. Tech. Sols., Inc. v. Medizine LLC*, No. 09 CIV. 8122 (LMM), 2010 WL 2034404, at *7 (S.D.N.Y. May 18, 2010) (*quoting Nexans Wires S.A. v. Sark–USA. Inc.*, 319 F.Supp.2d 468, 475 (S.D.N.Y. 2004)).

Plaintiff alleges that is has suffered loss "over the preceding year in excess of $5000 in, *inter alia*, conducting pre-suit damage assessment as a result of its discovery of PRHF using its datastores to further its operations." (FAC ¶ 307.)  This is not a compensable loss under CFAA. Loss under the CFAA is compensable only when they result from damage to, or the inoperability of, the accessed computer system. *New London Assocs., LLC v. Kinetic Soc*. LLC, 384 F. Supp. 3d 392, 408 (S.D.N.Y. 2019) (collecting cases). Loss "of business due to defendants' eventual use of the information, rather than a loss of business because of computer impairment" is too far removed from any computer damage to be cognizable. *Nexans Wires S.A. v. Sark–USA, Inc.*, 319 F.Supp.2d 468, 477 (S.D.N.Y.2004). Any loss suffered by the Plaintiff arising out of Defendants' use of the Balle Photographs "to unfairly compete after extraction from a computer does not appear to be the type of 'loss' contemplated by the statute." *Id.* at 478.

Plaintiff is correct that the cost of investigating a security breach can be a recoverable loss even if it turns out that no actual data damage or interruption of service resulted from the breach. (Opp. at p. 26); *Univ. Sports Pub. Co*., 725 F. Supp. 378, 387 (S.D.N.Y. 2010). But, as noted

above, Plaintiff has not adequately alleged that there was any "security breach" in the nature of accessing computers without authorization.

Count IX will be dismissed, but without prejudice. If Plaintiff can allege a security breach and at least $5,000 in damages flowing from an investigation into that security breach, it can state a claim. Similarly, Plaintiff may claim that "lost good will or business could provide the loss figure required," but if it does, it must plead that such loss "resulted from the impairment or unavailability of data or systems." *Register.com, Inc. v. Verio, Inc*., 126 F.Supp.2d 238, 252 n. 12 (S.D.N.Y.2000). The Second Circuit held in *Nexans Wires S.A. v. Sark–USA, Inc.,* 166 Fed.Appx. 559 (2d Cir.2006) that a CFAA plaintiff may recover lost revenue only when a loss is "connected to an interruption of service," upholding the district court's ruling that the plaintiff could not recover revenue lost "as a result of defendants' ability to unfairly compete for business" where, as here, the defendants allegedly misappropriated the plaintiff's proprietary information. *Id*. At 562-63. The Second Circuit's *Nexans* decision effectively precludes recovery for competitive harm suffered as a result of misuse or misappropriation. *Orbit One Commc'ns, Inc. v. Numerex Corp*., 692 F. Supp. 2d 373, 386 (S.D.N.Y. 2010). Right now, that is all that the FAC alleges – which, by the way, is but a thinly disguised duplication of its claim for copyright damages. *See New London Assocs., LLC v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 412 (S.D.N.Y. 2019).

Count IX is dismissed, with leave to replead within ten business days.

## CONCLUSION

Defendants' motion for partial dismissal of the complaint is granted as to Counts III, VII and IX. Counts VII and IX are dismissed without prejudice to amendment. The motion is otherwise denied.

This constitutes the opinion and order of the court. It is a written opinion. The Clerk is directed to close the motion at Docket #29.

Dated: September 30, 2021

_____

U.S.D.J.

BY ECF TO ALL COUNSEL